IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

JASON C. HOWARD,

        Plaintiff,

        v.                                      Civil Action No. 3:06-cv-85

MICHAEL ASTRUE,
Commissioner of Social Security,

        Defendant.

**REPORT AND RECOMMENDATION
SOCIAL SECURITY**

**I. Introduction**

A.    Background

        Plaintiff, Jason C. Howard, (Claimant), filed his Complaint on August 16, 2006, seeking

Judicial review pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3) of an adverse

decision by Defendant, Commissioner of Social Security, (Commissioner).[1]  Commissioner filed

his Answer on January 16, 2007.[2]   Claimant filed his Motion for Summary Judgment on

February 19, 2007.[3]  Commissioner filed his Motion for Summary Judgment on March 7, 2007.[4]

B.    The Pleadings

        1.    Claimant's Motion for Summary Judgment.

        2.    Commissioner's Motion for Summary Judgment.

---

[1] Docket No. 1.

[2] Docket No. 9.

[3] Docket No. 11.

[4] Docket No. 13.

C.    <u>Recommendation</u>

I recommend that:

1.    Claimant's Motion for Summary Judgment be GRANTED and the case REMANDED to the Commissioner because the ALJ failed to adequately consider the objective medical records.  The Court further recommends that Commissioner give this case expedited consideration.

2.    Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above.

## II.  Facts

A.    <u>Procedural History</u>

Claimant filed applications for Disability Insurance Benefits and Supplemental Security Income, alleging disability since July 13, 2001.  The claims were denied initially and on reconsideration.  Claimant requested a hearing before an ALJ and received a hearing on August 24, 2005.  The ALJ issued a decision unfavorable to Claimant on October 27, 2005.  Claimant requested review by the Appeals Council, but it denied the request.  Claimant brought this action, which proceeded as set forth above.

B.    <u>Personal History</u>

Claimant was 26 years old on the date of the August 24, 2005 hearing before the ALJ. Claimant has a high school education in a special education curriculum, along with training in automobile body work. Claimant has prior relevant work experience as an oil field laborer, shop helper, cashier, truck mechanic, and rig hand.

C.    <u>Medical History</u>

The following medical history is relevant to the time period during which the ALJ concluded that Claimant was not under a disability: July 13, 2001 – October 27, 2005.[5]

**David B. Wamsley, 3/5/96, Tr. 115**
WISC-III (IQ Test)
Verbal: 83, 13 (percentile)
Performance: 100, 50 (percentile)
Full scale: 90, 25 (percentile)

WAIT
Reading: 49 (standard score), less than 1 (percentile), 3-4 (grade level)
Mathematics: 67 (standard score), 1 (percentile), 5-0 (grade level)
Writing: 66 (standard score), 1 (percentile), 3-0 (grade level)

**United Hospital Center, 7/13/01, Tr. 120**
Diagnosis: injury to right shoulder at work

**Sarah J. Ramsay, 7/13/01, Tr. 127**
Impression of right shoulder: complex fracture involving the glenoid, coracoid, and acromion processes

**Matthew Buchanan, M.D. and David F. Hubbard, M.D., 9/12/01, Tr. 159**
Assessment: two months status post open reduction internal fixation of the right scapula

**David F. Hubbard, M.D., 8/31/01, Tr. 162**
Assessment: improved status post I & D of a scapula abscess at this time

**Jean Basta, M.D. and David F. Hubbard, M.D., 8/1/01, Tr. 165**
Assessment: improving, status post ORIF of right glenoid and right acromion fracture

**Adolph J. Yates, Jr., M.D., 7/25/01, Tr. 166**
Assessment: there is concern about low grade fevers, especially given the extensive nature of the

---

[5] Claimant only met the insured status requirements for disability insurance benefits until September 30, 2003.

Some of the evidence in the record comes from before and after the relevant time period. Evidence obtained prior to the alleged onset date may be relevant to the instant claim. See Tate v. Apfel, 167 F.3d 1191, 1194 n.2 (8th Cir. 1999); Burks-Marshall v. Shalala, 7 F.3d 1346, 1348 n. 6 (8th Cir. 1993); Williams v. Barnhart, 314 F. Supp. 2d 269, 272 (S.D.N.Y. 2004). Evidence from after the relevant time period should also be considered as long as it relates to the relevant time period. Wooldridge v. Bowen, 816 F.2d 157, 160 (4th Cir. 1987).

injury and a large amount of swelling.

**Jean Basta, M.D. and David F. Hubbard, M.D., 7/15/01, Tr. 170**
Diagnosis: right scapula fracture with involvement into the glenoid and acromion

Assessment: right scapula fracture with extension into the glenoid, coracoid and acromion

**William R. Post, M.D., 8/25/03, Tr. 178**
Diagnosis: shoulder pain, Fx scapula glenoid fossa, pain or mechanical complication ortho device

Prognosis: guarded/ uncertain

**William R. Post, M.D., 6/9/03, Tr. 180**
Diagnosis: shoulder pain, Fx scapula glenoid fossa, pain or mechanical complication ortho device

Prognosis: guarded/ uncertain

**William R. Post, M.D., 8/25/03, Tr. 182**
Diagnosis: shoulder pain, Fx scapula glenoid fossa, pain or mechanical complication ortho device

Prognosis: expect improvement with physical therapy, guarded/ uncertain

**William R. Post, M.D., 3/21/03, Tr. 184**
Diagnosis: shoulder pain, Fx scapula glenoid fossa, pain or mechanical complication ortho device

**William R. Post, M.D., 2/24/03, Tr. 185**
Diagnosis: shoulder pain, Fx scapula glenoid fossa

Prognosis: expect improvement with physical therapy

**William R. Post, M.D., 2/24/03, Tr. 187**
Diagnosis: shoulder pain, Fx scapula glenoid fossa, pain or mechanical complication ortho device

**William R. Post, M.D., 1/27/03, Tr. 188**
Diagnosis: shoulder pain, Fx scapula glenoid fossa, pain or mechanical complication ortho device

Prognosis: expect improvement with physical therapy

**William R. Post, M.D., 1/27/03, Tr. 190**
Diagnosis: shoulder pain, Fx scapula glenoid fossa, pain or mechanical complication ortho device

**William R. Post, M.D., 12/30/02, Tr. 191**
Diagnosis: shoulder pain, Fx scapula glenoid fossa, pain or mechanical complication ortho device

Prognosis: expect improvement with physical therapy

**William R. Post, M.D., 12/30/02, Tr. 193**
Diagnosis: shoulder pain, Fx scapula glenoid fossa, pain or mechanical complication ortho device

**William R. Post, M.D., 12/16/02, Tr. 194**
Diagnosis: shoulder pain, Fx scapula glenoid fossa, pain or mechanical complication ortho device

Prognosis: expect improvement with physical therapy

**William R. Post, M.D., 12/16/02, Tr. 196**
Diagnosis: shoulder pain, Fx scapula glenoid fossa, pain or mechanical complication ortho device

**William R. Post, M.D., 12/12/02, Tr. 197**
Pre-operative diagnoses: right shoulder stiffness, status post open reduction and internal fixation of glenoid fracture, pain secondary to retained hardware

Post-operative diagnoses: right shoulder stiffness, status post open reduction and internal fixation of glenoid fracture, pain secondary to retained hardware, unstable posterior labral tear

**William R. Post, M.D., 11/8/02, Tr. 202**
Diagnosis: shoulder pain, FX scapula glenoid fossa, pain or mechanical complication ortho device

Prognosis: expect improvement with operative treatment

**Physical Residual Functional Capacity Assessment, 5/7/04, Tr. 231**
Exertional limitations
  Occasionally lift and/or carry 50 pounds
  Frequently lift and/or carry 25 pounds
  Stand and/or walk for a total of about 6 hours in an 8 hour work day
  Sit for a total of about 6 hours in an 8 hour work day
  Push and/or pull: unlimited

Postural limitations
    Climbing ramps/stairs, balancing, stooping, kneeling, crouching, crawling: frequently
    Climbing ladders/ropes/scaffolds: occasionally

Manipulative limitations
    Reaching in all directions: limited
    Handling, fingering, feeling: unlimited

Visual limitations: none established
Communicative limitations: none established
Environmental limitations: none established

**Jeffrey Carpenter, M.D., 7/20/03, Tr. 265**
Impression: normal appearing right brachial plexus without evidence of abnormal enhancement or involvement by a mass lesion, metallic artifacts within the right shoulder due to prior surgery

**Physical Residual Functional Capacity Assessment, 7/14/04, Tr. 267**
Exertional limitations
    Occasionally lift and/or carry 20 pounds
    Frequently lift and/or carry 10 pounds
    Stand and/or walk for a total of about 6 hours in an 8 hour work day
    Sit for a total of about 6 hours in an 8 hour work day
    Push and/or pull: unlimited

Postural limitations
    Climbing, balancing, stooping, kneeling, crouching, crawling: occasionally

Manipulative limitations
    Reaching in all directions: limited

Visual limitations: none established
Communicative limitations: none established

Environmental limitations
    Wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation: unlimited
    Extreme cold, extreme heat, hazards: avoid concentrated exposure

**Jean Basta, M.D. and David Hubbard, M.D., 8/25/01, Tr. 276**
Discharge diagnosis: superficial infection of the right scapula

**ChuanFang Jin, M.D., 3/25/02, Tr. 279**
Assessment: chronic neck pain, status post cervical surgery

**Jack S. Koay, M.D., 6/3/03, Tr. 287**
Clinical impression: status post open reduction with internal fixation of left glenoid and acromion fracture performed on July 19, 2001, status post irrigation and debridement of superficial wound with secondary closure for the scapular abscess performed on August 24, 2001, status post arthroscopic labral repair, posterior labral right shoulder, status post arthroscopic capsular release and manipulation under anesthesia, status post open hardware removal of right shoulder, status post arthroscopic debridement with chondroplasty, limited and status post insertion of local anesthetic infusion catheter performed on July 19, 2001, significant clinical residual problems including pain, weakness of right upper extremity, muscle atrophy of the right shoulder, and stiffness of the right shoulder

Prognosis: it is premature to make a prognosis

**Dennis Porter, A.T.C. and Debbie Rexroad, P.T., 12/28/01, Tr. 303**
Assessment: Jason continues to experience apprehension although less guarding throughout manual (illegible)

**Debbie Rexroad, P.T., 12/21/01, Tr. 305**
Assessment: fair tolerance to (illegible) complains of increased shoulder pain

**Debbie Rexroad, P.T., 12/18/01, Tr. 307**
Assessment: patient exhibits improved PROM

**Debbie Rexroad, P.T., 11/28/01, Tr. 315**
Assessment: GH joint mobility improving, continued lateral tightness and scapular/shoulder weakness

**Debbie Rexroad, P.T., 11/8/01, Tr. 324**
Assessment: right upper trapezius tightness

**Debbie Rexroad, P.T., 10/31/01, Tr. 328**
Assessment: PROM continued to be limited by pain; patient was hesitant with AROM right shoulder 2 degrees pain

**Dennis Porter, A.T.C. and Debbie Rexroad, P.T., 10/17/01, Tr. 333**
Assessment: Jason was unable to perform walking

**Dennis Porter, A.T.C. and Debbie Rexroad, P.T., 10/15/01, Tr. 334**
Assessment: Jason displays fair inferior (illegible) glide

**Debbie Rexroad, P.T., 10/5/01, Tr. 339**
Assessment: unable to tolerate light manual resistance with right shoulder 1R/ER 2 degrees complains of pain

**Debbie Rexroad, P.T., 10/3/01, Tr. 340**
Assessment: decreased tolerance to manual therapy 2 degrees pain

**Debbie Rexroad, P.T., 9/26/01, Tr. 343**
Assessment: PROM improving; fair tolerance to manual therapy 2 degrees pain

**Dennis Porter, A.T.C. and Debbie Rexroad, P.T., 9/17/01, Tr. 347**
Assessment: Jason continues to be apprehensive

**Debbie Rexroad, P.T., 9/11/01, Tr. 351**
Assessment: right shoulder PROM improved

**Dennis Porter, A.T.C. and Debbie Rexroad, P.T., 8/28/01, Tr. 358**
Assessment: Jason has poor passive caution to left shoulder (illegible)/VE and is extremely apprehensive with ROM (A/P)

**Debbie Rexroad, P.T., 8/21/01, Tr. 362**
Assessment: continued fair tolerance to Rx two degrees complains of acromial pain, no change with AROM, struggles with both flex

**Debbie Rexroad, P.T., 8/10/01, Tr. 366**
Assessment: poor tolerance to treatment, apprehensive with A/AA/PROM, unable to tolerate AA ER beyond neutral with Tibar ex.

**Debbie Rexroad, P.T., 8/8/01, Tr. 367**
Assessment: poor tolerance to Rx two degrees pain

**Debbie Rexroad, P.T., 12/27/02, Tr. 380**
Comment/Assessment: there is a report of popping at superior aspect of right GH joint on 12/26 with ER, reports sharp pain and sensation of warmth at superior GH joint/lateral arm, PROM 12/27 limited by pain, tenderness post/superior GH joint, lateral aspect acromion

**Debbie Rexroad, P.T., 12/23/02, Tr. 383**
Comment/Assessment: c/c of pain/pressure at subacromial space extending along clavicle, spine of scapula, ER to eighty degrees, flex to ninety degrees with significant restrictions, effort required to obtain passive flex 3110 degrees

**Debbie Rexroad, P.T., 12/19/02, Tr. 385**
Assessment: greater ease with obtaining eighty degrees ER than with flex PROM

**Debbie Rexroad, P.T., 8/26/02, Tr. 394**
Assessment: pain/pressure continues to limit flex, abd PROM greater than ninety degrees

**Debbie Rexroad, P.T., 8/9/02, Tr. 402**

Assessment: continued pain, discomfort with PROM

**Debbie Rexroad, P.T., 8/2/02, Tr. 405**
Assessment: no changes with willingness to move right shoulder due to pain

**(Illegible) and Debbie Rexroad, P.T., 7/31/02, Tr. 406**
Assessment: patient had poor tolerance to PROM and manually resisted 1R/ER with complains of increased pain, severe strength deficit noted with 1R/ER noted with manually resisted 1R/ER

**Debbie Rexroad, P.T., 6/24/02, Tr. 422**
Assessment: PROM limited by pain, tightness

**(Illegible) and Debbie Rexroad, P.T., 6/21/02, Tr. 423**
Assessment: patient exhibits difficulty completing kincom isom ER

**(Illegible) and Debbie Rexroad, P.T., 6/17/02, Tr. 425**
Assessment: patient PROM limited by pain

**(Illegible) and Debbie Rexroad, P.T., 6/12/02, Tr. 427**
Assessment: patient appeared to have difficulty completing exercises two degrees pain

**Debbie Rexroad, P.T., 5/24/02, Tr. 432**
Assessment: overall good strength right VE if arm is positioned close to body

**Debbie Rexroad, P.T., 5/1/02, Tr. 446**
Assessment: patient appears to be hesitant to use right VE with ADL's two degrees pain; holds elbow close to side with body blade

**Debbie Rexroad, P.T., 4/23/02, Tr. 451**
Assessment: unable to perform isokinetic pull at 90, 180 degrees 2 degrees pain, weakness

**Dennis Porter, A.T.C. and Debbie Rexroad, P.T., 4/16/02, Tr. 455**
Assessment: Jason continues to be extremely protective with right shoulder, using left for function

**Debbie Rexroad, P.T., 4/2/02, Tr. 461**
Assessment: complains of pain as limitation with strengthening exercises

**Debbie Rexroad, P.T., 3/19/02, Tr. 469**
Assessment: right shoulder AROM improved from 2/26 measurements

**Dennis Porter, A.T.C. and Debbie Rexroad, P.T., 1/23/02, Tr. 494**
Assessment: passive ROM appeared less restrictive with all

**Dennis Porter, A.T.C. and R. Gauton-Weber, M.S.P.T., 1/16/02, Tr. 497**
Assessment: Jason displayed less soft tissue restriction with passive motion

**Dennis Porter, A.T.C. and Debbie Rexroad, P.T., 1/2/02, Tr. 503**
Assessment: Jason exhibits a decrease in apprehension and slight improvement in manually resisted IR and ER

**Dennis Porter, A.T.C. and Debbie Rexroad, P.T., 4/3/03, Tr. 532**
Assessment: Jason had difficulty with isometric pushing

**Debbie Rexroad, P.T., 1/2/03, Tr. 573**
Assessment: effort required for PROM flexion greater than 110 degrees, minimal restrictions with ER PROM to seventy degrees

**Gregg M. O'Malley, M.D., 6/28/05, Tr. 576**
Clinical impression: the patient has a clear cut muscular denervation around the shoulder girdle secondary to a bracial plexopathy. It is unlikely he can be employed with only use of his left arm and his right arm is useless. There are only a few surgeons in the world who can help.

**L. Jack Stemple, M.D., 3/29/05, Tr. 580**
Impression: severe right upper extremity injury with history of brachial plexus injury and fracture of the scapula, clavicle, and glenoid

**Scott L. Silverman, M.D., 12/29/04, Tr. 584**
Impression: the patient suffers from a bad shoulder with brachial plexopathy

D.      Testimonial Evidence

Testimony was taken at the August 24, 2005 hearing. The following portions of the

testimony are relevant to the disposition of the case. \

[EXAMINATION OF CLAIMANT BY ALJ]

Q      Do you have a driver's license?

A      Yes, ma'am.

Q      Do you drive a car?

A      Yes, ma'am.

Q      About how many miles do you drive in a week?

A        Around 50 to 100.

*              *              *

Q        Do you smoke?

A        No, ma'am.

*              *              *

Q        All right.  Tell me a little bit about your days.  What do you do when you get up in the morning?

A        I get up, get dressed.  Sit on the couch and watch TV for a little bit.  And then get something to eat.

Q        Do you do a little cooking?

A        No.  I, I can fix a sandwich for my son once in a while.  I, you know.

Q        All right.  Do you play with the baby?

A        Well, I'm limited big time on playing with him.  He's four and he's, he's one of them rowdy little boys and I can't play like I want to with him.  Just get down on the floor, I can't do, I can't do it.  I got to continue reminding him, got to not jump on me and, and things like that.  I hate telling him that, but, it just hurts me too bad.

Q        Do you help with the grocery shopping?

A        Yes.  Me and my wife goes together.

Q        How much can you lift when you go grocery shopping?

A        I can't lift too much because it starts putting too much strain on my good arm.  And it transfers over to my right.

Q        About how much?  A bag of sugar, a gallon of milk?

11

A       About a gallon of milk.

Q       Do you do any vacuuming around the house?

A       I tried it.  I, we really don't have a whole lot of carpet.  We got mostly hardwood

floors.

Q       Are you able to use the vacuum cleaner when you do?

A       A little bit, but it just, pushing and pulling it back, it puts a strain on me.

Q       Are you able to carry the bags of groceries in the house, into the house?

A       A few things, but something light like bread and little things like that I can bring

into the house.

Q       So you can lift about a five pound bag of sugar and put it in the basket?

A       Yes - -

Q       Can you carry it across the room?

A       Yeah.

Q       Does that hurt you?

A       A little, yeah.

Q       Do you have any outside activities that you participate in?

A       I used to, you know, you mean like yard work?

Q       Anything - -

A       Oh.

Q       Outside the house that you do or go or places you go.

A       I just go to my mother's.  I walk around in the yard.  Me and my son.

Q       Do you ever take any walks any further than that for exercise?

A       No, ma'am, just around the yard.

Q       Do you have any hobbies that you, you try to practice at home?  Or that you participate in?

A       Actually, I really, hobbies I was like doing, I can't do anymore like softball and sports and stuff like that.  I can't, I can't do anymore.

Q       Are you able to help with any other cleaning around the house?

A       Picking our clothes up and put them in a basket.

Q       Anything else?

A       Just picking toys.  Having Tyler put his toys up in his toy box.

Q       Okay.  Take any trips with your family?  Or the baby.

A       Just to grandma's.

Q       Do you help with the laundry?

A       Sometimes, yeah.  I'll put, you know, detergent in the water when she's busy.

Q       What about your personal care, can you take care of your own personal needs?

A       I have problems with shaving, bathing.  A little trouble getting dressed.

Q       Do you visit friends?

A       No, no, Your Honor.

Q       Just relatives? Just your mother?

A       Just my mother.

*               *               *

EXAMINATION OF CLAIMANT BY ATTORNEY:

Q       How often do you have the level ten pain that you indicated?

13

A       About five hours of the day.

Q       Okay.  Is there any activity that seems to provoke that?

A       If I do all the lifting, like if I try to do too much with my left and then it just transfers over.  If I try to help, try to help her with things, I just, it just hurts more.

Q       How about reaching your right shoulder, just like reaching your arm above your head.  Are you, how are you able to do that?

A       I can, no.  That just, I'm really limited on how far I can get.

Q       How about in front of you?

A       I have to bring things closer to me.  Like to write my name, to, to check things or you know.

Q       What about like just basic things like trying to eat?

A       I got to bring, I just bring myself to the right hand because it's, I don't know how to explain it.

                    *                    *                    *

Q       Now, going back to your limitations on the right side.   Does it affect your hand?

A       Yeah.

Q       How so?

A       It goes numb.  My forearm, it just, just goes numb.  I mean, it, my two, my pinkie finger and my other finger besides the pinkie goes numb.

Q       The ring finger?

A       Yeah - -

Q       Fourth - -

A        Yeah.

Q        Okay.  How does it, does it affect your grip strength?

A        I have lost all of it.  I was dominant right-handed.  And [INAUDIBLE] I lost pretty much all my strength.

Q        How about just something like signing your name?  Holding a pen or a pencil, do you have any difficulty doing that?

A        A little difficulty.  I usually just hurry up and scribble my name real fast, so, but I had a little difficulties [INAUDIBLE] making the perfect, because my fingers and stuff are like, I don't know, like.  I don't know how to explain it.  It's just like they're locking up or - -

Q        Okay.

A        Not as - -

Q        Difficult to move?

A        Yeah.  Difficult to move.

Q        Okay.  Now there was some mention you were having problems with a pinched nerve also in your neck?

A        Yeah.  If I turn my head a certain way and try to force it to go, like look to my right side, it gives me headaches.  I mean it's rest of the day headaches.

Q        How often do you have that, those symptoms?

A        About every day.

Q        How often are you having the headaches?

A        They last pretty much all day.

Q        Is that a result from your injury, that - -

A       Yeah.

Q       The nerve?

A       Yes, ma'am.

Q       Okay.  How well are you sleeping at night?

A       Not very well.  I mean, I sleep decent until I roll over on my back.  Because I was a tosser and turner before I got hurt.  And when I lay on my back it feels like it just tearing everything apart, so it wakes me up and, of course, wakes my wife up too.  She doesn't like it too well.

Q       Now with your schooling, there was a mention of being dyslexic?

A       Yes, ma'am.

Q       Did that ever affect you on any of your jobs in the past?

A       Yes, ma'am.

Q       How so?

A       Like NAPA, didn't know how to do the cash, do the cash register very good and I was too slow doing it.  And they didn't - -

Q       How, how did that job end?

A       They let me go because they said I was too slow and so they just let me go.

Q       Okay.  And how would you rate your ability to concentrate?

A       Before I had a good concentration.  Now, it's, it seems like I have none.

*               *               *

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]

Q       All right.  And what region will you be testifying regarding?

A       State of West Virginia along with [INAUDIBLE] corresponding [INAUDIBLE].

Q       Would you please characterize Mr. Howard's past jobs?

A       Okay.  Work as a rig hand, it's recognized at heavy exertional.  Specific vocational preparation of 2, therefore, semi-skilled.  Work as the oil field laborer.  It's a very heavy exertional level.  Specific vocational preparation of 1, unskilled.  The work as a truck mechanic.  Customarily a truck mechanic is recognized at a medium exertional.  Specific vocational preparation of 7, skilled. The DOT also recognizes as what is known as truck mechanic helper.  Which is heavy, SVP 3, semi-skilled.  It appears he was doing the helper and the mechanic job, together, [INAUDIBLE] heavy exertional.  The skill levels would be [INAUDIBLE] 7.  Now the work that was, [INAUDIBLE] shop helper.  Customarily that is a medium SVP 4, semi-skilled job.  However, [INAUDIBLE] is a combination of jobs.  And I feel strongly he was doing it a SVP 2 level, unskilled.

Q       And the cashier job?

A       Light exertional, specific vocational preparation of 3, semi-skilled.

Q       All right, if you would take a hypothetical person of, of Mr. Howard's age, background, work experience, educational level who could do limit, a range of light work that would involve no lifting above his waist, no overhead reaching at all with his dominant right arm, unskilled, entry-level, limited range of motion in his neck, limited strength in his dominant right hand and arm, can not climb rope, ladders, scaffolds.  Could that person do any of his prior relevant work?

A       No, ma'am.

Q       Are there any jobs that he could perform?

17

Q        I should add that he should avoid extremes in temperature, heat and cold, as well.

A        May I ask for a clarification, ma'am?

Q        Sure.

A        With limited range of motion in that, we're limiting it by ten degrees less than normal or are we limiting it greater than that?

Q        By ten degrees.

A        All right.  The following would fit within the hypothetical.  Work as an assembler of electrical accessories.  There are 70,000 national, region, 500.  Information clerk, 95,000 national, 800 in the region.  Storage facility rental clerk, 85,000 national, 300 regional.  That's a sample, Your Honor.

Q        Would a storage assembly, storage facility rental clerk, rather, would he, would that person have to write or count money?

A        [INAUDIBLE] informs customer of space available and the rates.  Responsible to check ID of the person coming in and the person signing in [INAUDIBLE].

Q        Okay.  What about the information clerk?  Would they need to write or handle money?

A        The information clerk would have to write [INAUDIBLE].

Q        All right.  What about at a sedentary level?  Would there be any work that this hypothetical person could do?

A        Work as a weight tester.  There are 60,000 national, region 200.

Q        Weight tester?

A        That's an individual that's responsible for tending the machine that records the

weight of certain paper.  Their responsibility is to  put the strip of paper in [INAUDIBLE]

sample gives you the weight and it's rated on a graph, where an individual's responsibility is just

take that information and put into the graph [INAUDIBLE].

Q       Okay - -

A       So, then [INAUDIBLE].

Q       Okay.  Did we get the numbers on those?

A       I'm sorry.  60,000 nationals, 200 regional.  Taper printed circuit layout.

HA          Taper?  T-A-P-E-R?

VE          That's correct.

HA          Okay.

VE          There are 60,000 national, region, 400.  Final assembler, 43,000 national,

region 50.  That's a sample, Your Honor.

BY ADMINISTRATIVE LAW JUDGE:

Q       The final assembler, would that require dexterity with both hands?

A       Yes, ma'am.

Q       And I take it that a taper printer, printout layout person - -

A       Taper printed circuit layout.

Q       Taper printed circuit layout, does that require dexterity with both hands?

A       No.  Because [INAUDIBLE] that they're putting on it.

Q       Okay.  What about the weight tester?

A       Occasional use of both hands.

Q       Just occasional?

A Because once the piece of paper gets put into the testing machine, the rest is making sure that it goes through.

Q What if that person, hypothetical person, is off task one-third of the time due to lack of concentration, persistence and pace?

A He would not be able to perform any of these jobs.

Q He's off task one-third time due to pain?

A Not able to perform any of these jobs.

*   *   *

E. <u>Lifestyle Evidence</u>

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how the Claimant's alleged impairments affect his daily life.

- Pays bills, takes out the trash, and cares for his child (Tr. 72)

- Prepares meals with cereal and sandwiches (Tr. 72)

- Shops for food and clothing (Tr. 73)

- Reads magazines, watches television, and listens to the radio (Tr. 73)

- Goes swimming, hunting, and fishing (Tr. 74)

- Attends movies (Tr. 74)

- Smoked during the relevant time period (Tr. 577)

- Drives fifty to one hundred miles per week (Tr. 616)

- Can lift a gallon of milk or a five pound bag of sugar (Tr. 621)

### III.  The Motions for Summary Judgment

A.      Contentions of the Parties

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant asserts that the ALJ erred in (1) not considering the opinion of Dr. Koay and (2) finding that a substantial number of jobs exist in the national economy Claimant can perform.

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Commissioner contends that the ALJ properly considered the medical evidence and correctly determined Claimant can perform a significant number of jobs in the national economy.

B.      The Standards.

1.      Summary Judgment.  Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v.  Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.      Judicial Review.  Only a final determination of the Commissioner may receive judicial review.  See, 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir.

1986).

3.      Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that he has a medically determinable impairment that is so severe that it prevents him from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.      Social Security - Medically Determinable Impairment.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.      Disability Prior to Expiration of Insured Status- Burden.  In order to receive disability insurance benefits, an applicant must establish that he was disabled before the expiration of his insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.      Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.      Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence

inquiry." <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

        8.    <u>Social Security - Substantial Evidence - Defined</u>.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

        9.    <u>Social Security - Sequential Analysis</u>.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether he has a severe impairment, 3) whether his impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform his past work; and 5) whether Claimant is capable of performing any work in the national economy.  Once Claimant satisfies Steps One and Two, he will automatically be found disabled if he suffers from a listed impairment.  If Claimant does not have listed impairments but cannot perform his past work, the burden shifts to the Secretary to show that the claimant can perform some other job. <u>Rhoderick v. Heckler</u>, 737 F.2d 714-15 (7th Cir. 1984).

C.    <u>Discussion</u>

I.

<u>The ALJ's Failure to Consider Dr. Koay's Opinion</u>

Claimant first alleges the ALJ erred by failing to consider the opinion of Dr. Koay.

Claimant states that Dr. Koay determined Claimant had a temporary total disability, but the ALJ ignored this opinion.  Commissioner argues substantial evidence supports the ALJ's consideration of the evidence.  Commissioner notes that while Dr. Koay stated Claimant was totally disabled temporarily, he did not say he had a permanent disability.  Commissioner also points out the opinions of other physicians in support of the ALJ's analysis.

It is well established that the ALJ must adequately analyze the evidence in an opinion. Gordon, 725 F.2d at 236 (quoting Arnold v. Sec'y of Health, Educ. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977)).  The law does not require the ALJ to consider every piece of evidence so long as the ALJ articulates at some minimum level his analysis of a particular line of evidence. Green v. Shalala, 51 F.3d 96, 101 (7th Cir. 1995).  On the other hand, the ALJ may not "pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence."  Hardman v. Barnhart, 362 F.3d 676, 681 (10th Cir. 2004).

In this case, the ALJ plainly failed to give adequate consideration to the evidence.  This involves not only the failure to consider Dr. Koay's opinion, which standing alone may have been excused, but the failure to consider almost any of the objective medical evidence in the record.  The ALJ's consideration of the objective medical evidence may be found in under half a page.  (Tr. 22).  Moreover, the ALJ only expressly considered ***one page*** of the objective records. (Id.).  Although the ALJ gave consideration to Claimant's daily activities and subjective complaints (Tr. 21-22), the lack of consideration of the objective medical records deprives the ALJ's opinion of substantial evidence.  This case should be remanded to Commissioner for further consideration.

II.

<u>Whether the ALJ Complied with SSR 00-4p</u>

Claimant also argues the ALJ failed to comply with SSR 00-4p. Claimant argues this requires the ALJ to ask the Vocational Expert about any conflicts between the jobs he identifies in response to hypothetical questions and the Dictionary of Occupational Titles (DOT). If the information the Vocational Expert provides conflicts, Claimant states the Ruling mandates the ALJ seek an explanation for the conflict. Claimant states the ALJ did not do that in this case. Claimant also contends these errors had an important effect. The ALJ limited Claimant to no overhead reaching, but some of the jobs the Vocational Expert identified required frequent reaching. It is unclear whether the reaching in these jobs will not involve overhead reaching. Claimant also contends the ALJ's hypothetical question failed to advise the Vocational Expert of Claimant's limitations in reading. Claimant argues that when these limitations are considered, the jobs identified by the Vocational Expert conflict with the DOT. Commissioner contends that SSR 00-4p does not require the ALJ to inquire into every discrepancy between Vocational Expert testimony and the DOT, but only evident errors. Commissioner also contends Claimant should not be allowed to raise this argument now when he did not make it at the administrative hearing. Finally, Commissioner argues the ALJ's hypothetical question adequately advised the Vocational Expert of Claimant's limitations regarding reading.

When a claimant shows an inability to resume prior work, the burden falls to Commissioner to demonstrate "that the claimant, considering his age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternate job and that this type of job exists in the national economy." <u>Coffman v. Bowen</u>, 829 F.2d 514, 518 (4th Cir. 1987). The Regulations provide the ALJ may consider VE testimony and the DOT in

determining whether work exists suited to a claimant's residual functional capacity. 20 C.F.R. § 404.1566. Social Security Ruling (SSR) 00-4p states VE testimony and the DOT should normally be consistent. When "an apparent unresolved conflict" exists between these sources, the ALJ must "elicit a reasonable explanation for the conflict." Id. Neither source automatically prevails. Id. The ALJ should resolve a conflict by deciding whether the VE testimony is reasonable and provides grounds for relying on the testimony over the DOT.

In Justin v. Massanari, 20 Fed. Appx. 158, 160 (4th Cir. 2001), the court considered Acquiescence Ruling (AR) 00-3(10), which is substantively the same as SSR 00-4p. The court found the Ruling only required the ALJ ask about obvious differences between Vocational Expert testimony and the DOT and "specifically declines to place an obligation on ALJs to uncover such discrepancies." Id. The court also cited to SSR 00-4p in support of its finding. Id.

In light of this law, it is clear that in this circuit the ALJ does not have an absolute duty to question a Vocational Expert on whether his testimony is consistent with the DOT. Rather, such a duty only exists where there is an obvious difference.

In this case, the ALJ did not err by failing to inquire regarding any discrepancies between the VE's testimony and the DOT because no such discrepancies were obvious. At the beginning of the VE's testimony, the ALJ asked him to describe the DOT. (Tr. 630). The VE then testified regarding Claimant's past work as classified by the DOT. (Tr. 630-31). It is evident testimony consistent with the DOT was expected. When the VE identified the positions of final assembler and taper printed circuit layout person, the ALJ inquired regarding whether these positions would require frequent use of both hands. (Tr. 633). The ALJ considered that the positions may conflict with the limitation in the hypothetical he provided of limited use of the right hand and

arm and sought to resolve the conflict. (Tr. 631, 633). The court has not identified any other obvious discrepancies. Therefore, the ALJ did not commit legal error by failing to specifically inquire about whether VE's testimony was consistent with the DOT.

The Court now turns to Claimant's arguments that the case should be remanded because some of the positions the VE identified and the ALJ relied upon have DOT requirements different from the ALJ's RFC. Claimant notes the ALJ's RFC limited Claimant to no overhead reaching with his right arm. (Tr. 21). The ALJ's hypothetical also included this limitation. (Tr. 631). Yet Claimant states that several positions identified by the VE have DOT requirements involving frequent reaching. Claimant argues it is unclear whether this would involve overhead reaching and therefore the case should be remanded for clarification on this point. Commissioner argues that even if these jobs are inconsistent with the DOT, Claimant can perform other positions. Furthermore, the ALJ may rely on job descriptions different from the DOT.

The positions the VE identified and the ALJ relied upon Claimant complains about are the jobs of assembler of electrical accessories, information clerk, and storage facility rental clerk. (Tr. 632). Commissioner has not disputed that the DOT descriptions of these positions state they involve frequent reaching.

The statute applicable to the issue here provides that to avoid an award of benefits, Commissioner must show "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A). In Hicks v. Califano, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979), the Fourth Circuit stated (albeit in a footnote) that 110 regional jobs represents a significant number of jobs under the statute.

Nevertheless, the statute permits Commissioner to demonstrate significant numbers of jobs in the national economy without reference to a claimant's local economy. It is axiomatic that unambiguous statutory language controls. Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 568 (2005). The plain terms of the statute permit Commissioner to show jobs "*either* in the region where such individual lives *or* in several regions of the country." 42 U.S.C. § 423(d)(2)(A) (emphasis added). The statute is phrased in the alternative.

A number of courts have interpreted the statute in this manner to permit Commissioner to deny disability benefits where the evidence shows significant numbers of jobs in the national economy, regardless of whether such jobs exist near the claimant. In Allen v. Bowen, 816 F.2d 600, 603 (11th Cir. 1987), the claimant offered new evidence to show significant numbers of jobs did not exist for him at the local level. Yet the court held that "The appropriate focus under the regulation, however, is the national economy. Thus, even if Allen's evidence were credible to the lack of jobs in his geographic area, his failure to disprove the existence of such jobs on a national scale would leave the ALJ's finding intact." Id. at 603 (citations omitted). In Dressel v. Califano, 558 F.2d 504, 508-09 (8th Cir. 1977), the court held that Commissioner need not demonstrate "that the job opportunities existed within the local area, but only that job opportunities exist in the national economy."

Discounting the positions Claimant disputes, the VE still identified the positions of weight tester, taper printer circuit layout, and final assembler. (Tr. 632-33). There are 60,000 national weight tester jobs and 200 local jobs. (Tr. 632). There are 60,000 national taper printer circuit layout jobs and 400 local positions. (Tr. 633). Finally, there are 43,000 national final assembler jobs and 50 local positions. (Id.). This easily represents a sufficient number of jobs

under the statute.  Of course, the determination in part I nevertheless means this part of the ALJ's analysis lacks substantial evidence.  The Court also encourages the ALJ to resolve any confusion between his RFC and the DOT.

Claimant also contends the ALJ erred in posing a hypothetical question to the Vocational Expert since the hypothetical did not adequately reflect Claimant's limitations in reading. Claimant states that the hypothetical should have included a statement that he could only read at a second grade level.  Commissioner contends the ALJ's hypothetical question adequately advised the Vocational Expert of Claimant's limitations.

The Fourth Circuit has held that valid hypothetical questions must "fairly set out all of claimant's impairments."  Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989).  The question must have "adequately reflected" a person's impairments.  Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005).  Recently, in Fisher v. Barnhart, 181 Fed. Appx. 359, 364 (4th Cir. 2006), the court emphasized that a hypothetical question need only convey the substance of a person's impairments at a general level.  The court quoted the Eighth Circuit for the notion "that [a hypothetical question] describing [the claimant] as capable of doing simple work adequately accounts for the finding of borderline intellectual functioning."  Id. (quoting Howard v. Massanari, 255 F.3d 577, 582 (8th Cir. 2001)).

The Court believes the ALJ's hypothetical question adequately reflected Claimant's limitations in reading.  The ALJ's hypothetical asked the Vocational Expert to assume a person having Claimant's "background, work experience, [and] educational level."  (Tr. 631).  The Vocational Expert heard Claimant's testimony that he graduated from high school in a special education curriculum.  (Tr. 615).  The Vocational Expert also heard Claimant testify he has had

29

problems with dyslexia in the past and that this contributed to his being fired from a cashier position. (Tr. 628-29). Finally, the Vocational Expert testified that he had reviewed Claimant's file. (Tr. 629). This means the Vocational Expert was exposed to psychologist David Wamsley's report that during high school Claimant tested at a second grade level of reading. (Tr. 118). Thus, the Court concludes the ALJ's hypothetical adequately considered Claimant's limitations in reading.

III.

<u>This Case Should Be Given Expedited Consideration and Assigned to a New ALJ on Remand</u>

Due to the errors discussed in part I, the Court takes time to encourage Commissioner to expedite consideration of this case on remand. <u>Briscoe v. Barnhart</u>, 425 F.3d 345, 357 (7th Cir. 2005); <u>Pollard v. Halter</u>, 377 F.3d 183, 195 (2d Cir. 2004); <u>Macon v. Sullivan</u>, 929 F.2d 1524, 1529 n. 18 (11th Cir. 1991); <u>Martin v. Barnhart</u>, 319 F. Supp. 2d 1381, 1384 (S.D. Ga. 2004). The review that would normally happen in a Social Security appeal cannot occur here because of the dearth of reasons for denying benefits given by the ALJ.

**IV. Recommendation**

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be GRANTED and the case REMANDED to the Commissioner because the ALJ failed to adequately consider the objective medical records. The Court further recommends that Commissioner give this case expedited consideration.

2.       Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: August 20, 2007

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE